BUTZ, J.
*696 In September 2014, a jury found defendant Daniel William Marsh (born in May 1997) guilty of two counts of first degree murder committed in April 2013 (finding that he personally used a deadly weapon in each instance) and sustained allegations of three special circumstances. It subsequently found defendant was sane at the time of the offenses. After making an individualized assessment of the appropriateness of the sentence for defendant, the trial court imposed an indeterminate life sentence with a minimum term of 52 years. The case was not fully briefed until July 2017.
On appeal, defendant argues that Miller v. Alabama (2012) 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 ( Miller ) and Roper v. Simmons (2005) 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 ( Roper )-which respectively prohibit the mandatory punishment of life without parole for minors for any offense, or the death penalty under any circumstances even for minors who commit homicide-both apply in the context of a sanity determination, with the result that the holdings require the resurrection of the doctrine abrogated under California law in which an "irresistible impulse" test is applied to determine a defendant's sanity (measuring the ability to conform one's behavior to the requirements of the law).[1] Therefore, defendant asserts that the sanity phase must be reversed and retried with instructions on this rejected standard. We reject this argument in the published portion of the opinion. Given the length of time it took to complete briefing in this matter, defendant also filed a supplemental brief seeking the application of a 2016 initiative amendment to his case because it is still not final, under *459 which prosecutors are stripped of their power to file charges against minors directly in criminal court without judicial intervention. The People concede that this initiative applies retroactively to defendant's pending appeal, and that we must conditionally reverse for proceeding in juvenile court.
Given the nature of defendant's appellate claims, we are not concerned with the evidence underlying his "extraordinarily heinous" offenses (to quote the trial court at sentencing). It is also clear defendant has deeply disturbed mental functioning, although that does not of itself align with the criteria absolving a defendant on the ground of insanity; for example, see the facts in *697 our opinion in People v. Bobo (1990) 229 Cal.App.3d 1417, 3 Cal.Rptr.2d 747, in which a jury found the defendant sane (though our analysis of the sufficiency of the evidence to support that determination was not part of the published section of the opinion). However, as we are not called upon to review the sufficiency of the evidence to support the jury's sanity finding in the present case, we do not need to also relate the entirety of this evidence. We thus omit the underlying facts from the published portion of the opinion, other than to note the teenaged defendant (one month shy of his 16th birthday) stalked a Davis neighborhood at night and randomly selected the home of the two victims to satisfy a long-standing (and oft-expressed) desire to kill, after which he mutilated their bodies.
FACTUAL AND PROCEDURAL BACKGROUND**
DISCUSSION
1.0 "Irresistible Impulse" Is Not a Constitutionally Mandated Test of Insanity
In the trial court, defendant argued that due process and the prohibition against disproportionate punishment required the trial court to instruct on irresistible impulse as the standard for sanity of a juvenile. He contended the same body of research on the development of brain functioning in adolescents that underlay the decisions in Miller and Roper with respect to punishment should apply equally to the determination of sanity, because this research documents the inability of adolescents to control their behavior. Notably absent from the argument was any authority beyond the effort to analogize to Miller and Roper . The trial court rejected the analogy and adhered to the statutory test for insanity, instructing the jury accordingly.
Defendant renews the claim on appeal in a scant argument of seven pages following a voluminous summary of the evidence at trial. He acknowledges that due process does not impose any particular definition of sanity on the states ( Clark v. Arizona (2006) 548 U.S. 735, 752-753, 126 S.Ct. 2709, 165 L.Ed.2d 842 [noting "no particular formulation has evolved into a baseline for due process"] ), or require the use of irresistible impulse as a measure of sanity ( Leland v. Oregon (1952) 343 U.S. 790, 801, 72 S.Ct. 1002, 96 L.Ed. 1302 ["the progress of science has not reached a point where its learning would compel us to require the states to eliminate the [']right and wrong['] test from their criminal law," and in any event "wide disagreement"
*698 regarding basic policy in criminal responsibility means that irresistible impulse as test is not " 'implicit in the concept of ordered liberty' "] ). However, he then simply reiterates his argument in the trial court that the decisions in Miller and Roper , by embracing the science of adolescent mental development as a basis for constitutionally ameliorating *460 the punishment of juveniles, also requires the application of this scientific research to sanity determinations of juveniles as a matter of due process and the bar against disproportionate punishment, with the consequence that irresistible impulse must be the standard for sanity (adding the straw argument that the evidence at trial warranted use of this standard).
What defendant disregards is the high court's express rejection of the idea that it should play any role in formulating a nationwide definition of insanity in constitutional terms, because it is a defense that has "historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law[,] and [the] changing religious, moral, philosophical, and medical views of the nature of [humankind]. This process of adjustment has always been thought to be the province of the States "; in its view, "[n]othing could be less fruitful" than "formulating a constitutional rule." ( Powell v. Texas (1968) 392 U.S. 514, 536, 88 S.Ct. 2145, 20 L.Ed.2d 1254, italics added ( Powell ).) Given this view, recently echoed in Clark v. Arizona , supra , 548 U.S. at pages 752 through 753, 126 S.Ct. 2709, due process cannot possibly compel the use of irresistible impulse as the test for sanity of juveniles since it is not part of any consensus on the elements within the concept of ordered liberty.
As for the constitutional prohibition against disproportionate punishment, Miller (the most recent decision in this area of jurisprudence) itself specifies that, "children are constitutionally different from adults for purposes of sentencing ." ( Miller , supra , 567 U.S. at p. 471, 132 S.Ct. 2455, italics added.) Their diminished culpability and greater potential for reformation make them " 'less deserving of the most severe punishments' " ( ibid ., italics added), which is not the same thing as saying they are less deserving of any punishment. Defendant does not provide even the most narrow of analytic bridges from decisions concerned with the constitutional proportionality of punishment to the insanity defense. As Powell explains, the constitutional protection against disproportionate punishment is interested in the nature of the conduct at issue only to the extent it supports the method or nature of the penalty imposed for the criminal violation ( Powell , supra , 392 U.S. at pp. 531-532, 88 S.Ct. 2145 ); it does not prohibit punishment for conduct in response to an irresistible impulse such as addiction to alcohol (public drunkenness being at issue in Powell ) except to the extent a state would make the status itself of addiction subject to criminal sanctions (as in Robinson v. California (1962) 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758, involving narcotics addiction). Without this limitation, "it is *699 difficult to see any limiting principle [to the protection against disproportionate punishment] that would serve to prevent this Court from becoming ... the ultimate arbiter of the standards of criminal responsibility, in diverse areas of the criminal law, throughout the country." ( Powell , supra , 392 U.S. at p. 533, 88 S.Ct. 2145.) Consequently, the constitutional protection against disproportionate punishment cannot be a basis for requiring irresistible impulse as a test for the sanity of juvenile defendants.
As Justice Black noted in his concurring opinion to the plurality opinion in Powell , "the question whether an act is 'involuntary' is ... an inherently elusive question, and one which the State may, for good reasons, wish to regard as irrelevant." ( Powell , supra , 392 U.S. at p. 544, 88 S.Ct. 2145.) He further observed that finding the standard of irresistible impulse compelled under the prohibition against disproportionate punishments creates the classic slippery slope at the bottom of which the *461 Supreme Court "would be forced to hold the States powerless to punish any conduct that could be shown to result from a 'compulsion' .... The result, to choose just one illustration, would be to require recognition of 'irresistible impulse' as a complete defense to any crime" ( id . at p. 544, 88 S.Ct. 2145, italics added), pointing out that sex offenders also often act out of " 'compulsion' " ( id . at p. 545, 88 S.Ct. 2145 ). Given that the majority of juvenile homicides seem to arise in the context of gang activity, we could easily foresee the mass exoneration of this antisocial behavior if a defense were available that the defendants could not help themselves under the pressure of their cohort to make use of guns against their victims. We cannot countenance construing constitutional law to mandate such a result. If not the threat of punishment, it is difficult to imagine what else society could do to restrain juveniles from criminal conduct. It is precisely this balancing of policies that is a task more suited for the Legislature than this court.
Indeed, our own Supreme Court in the context of the execution of mentally ill defendants rejected any analogy to the prohibition as disproportionate of the execution of the developmentally disabled ; "while it may be that mentally ill offenders who are utterly unable to control their behavior lack the extreme culpability associated with capital punishment, there is likely little consensus on which individuals fall within that category or precisely where the line of impairment should be drawn. Thus, we are not prepared to say that executing a mentally ill murderer would not serve societal goals of retribution and deterrence. We leave it to the Legislature ... to determine exactly the type and level of mental impairment that must be shown to warrant a categorical exemption from the death penalty." ( People v. Hajek and Vo (2014) 58 Cal.4th 1144, 1252, 171 Cal.Rptr.3d 234, 324 P.3d 88, italics added.) If mental illness is not sufficient to forestall execution, a fortiori it is not sufficient to exculpate a juvenile from a conviction for homicide.
*700 We consequently reject defendant's constitutional claim. The trial court thus properly instructed the jury on the standard for finding defendant not guilty by reason of insanity.
2.0 The 2016 Initiative Applies to Defendant***
DISPOSITION
The judgment of the criminal court is conditionally reversed and the matter remanded to the juvenile court with direction to hold a juvenile transfer hearing to determine defendant's suitability for treatment in juvenile or criminal court within 90 days of the issuance of our remittitur. If the juvenile court determines that defendant is the proper subject of criminal proceedings, it shall reinstate the criminal judgment. If the juvenile court finds that it would not have transferred defendant to a court of criminal jurisdiction, then it shall deem defendant's convictions to be juvenile adjudications and conduct a dispositional hearing within its usual time frame. ( People v. Vela (2017) 11 Cal.App.5th 68, 82-83, 218 Cal.Rptr.3d 1, review granted.)
We concur:
BLEASE, Acting P.J.
MURRAY, J.

People v. Drew (1978) 22 Cal.3d 333, 345, 149 Cal.Rptr. 275, 583 P.2d 1318 adopted this standard for determining sanity as a matter of judicial fiat, overruling long-standing criticism of this standard as removing the deterrence of punishment for those who otherwise were aware of the wrongfulness of a criminal act (e.g., People v. Hubert (1897) 119 Cal. 216, 221, 223, 51 P. 329 ). The electorate promptly abrogated Drew in 1982, enacting Penal Code section 25 to reinstate the traditional test of insanity under which a jury must find that a defendant either was not aware of the nature of the act committed or was not aware that the act was wrong. (People v. Horn (1984) 158 Cal.App.3d 1014, 1021, 1024-1027, 1031-1032, 205 Cal.Rptr. 119.)

See footnote *, ante .

See footnote *, ante .